Matter of Mekayla S. (2024 NY Slip Op 03584)

Matter of Mekayla S.

2024 NY Slip Op 03584

Decided on July 3, 2024

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 3, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., BANNISTER, GREENWOOD, AND KEANE, JJ.

69 CAF 23-00194

[*1]IN THE MATTER OF MEKAYLA S. ERIE COUNTY DEPARTMENT OF SOCIAL SERVICES, PETITIONER-RESPONDENT; MELANIE H., ALSO KNOWN AS MELANIE S., RESPONDENT-APPELLANT. (APPEAL NO. 1.)

CAITLIN M. CONNELLY, BUFFALO, FOR RESPONDENT-APPELLANT.
BENJAMIN MANNION, BUFFALO, FOR PETITIONER-RESPONDENT.

Appeal from an order of the Family Court, Erie County (Sharon M. LoVallo, J.), entered December 15, 2022, in a proceeding pursuant to Family Court Act article 10. The order, inter alia, determined that respondent had abused the subject child. 
It is hereby ORDERED that the order so appealed from is affirmed without costs.
Memorandum: In these proceedings pursuant to Family Court Act article 10, respondent mother appeals in appeal No. 1 from an order of fact-finding and disposition that, inter alia, adjudged that she abused her daughter. In appeal No. 2, the mother appeals from an order of fact-finding and disposition that, inter alia, adjudged that she derivatively abused her son. The adjudications arose from allegations that the mother's boyfriend sexually abused the daughter on multiple occasions.
The mother contends in both appeals that Family Court erred in admitting in evidence home surveillance videos depicting the abuse inasmuch as petitioner failed to establish the authenticity of the videos. Under the circumstances of this case, we conclude that the videos were sufficiently authenticated through testimony regarding their source and how they were discovered in conjunction with testimony supporting the conclusion that the videos depicted the area and individuals they purported to depict (see People v Goldman, 35 NY3d 582, 595-596 [2020]; see generally People v Jordan, 181 AD3d 1248, 1249-1250 [4th Dept 2020], lv denied 35 NY3d 1067 [2020]).
The videos were discovered by the Federal Bureau of Investigation (FBI) during an unrelated investigation in late January 2022 into the trading of child pornography. The FBI executed a search warrant upon a person (suspect) who was a subject of their investigation. The suspect admitted to an FBI special agent that he had been hacking into security web cameras and that, in 2019, he had hacked into a security camera and observed what he believed was an adult male sexually abusing a teenage girl. Following the suspect's directions, the FBI was able to obtain from the suspect's computer three videos and, from there, details regarding the security camera login information, including an email address. Through the FBI's investigative work, together with the assistance of the New York State Police, it was determined that the videos came from a camera in the house in which the mother resided with the subject children and her boyfriend. The FBI agent explained how he copied the videos from the suspect's computer onto a DVD, and he testified that the videos on the DVD that was admitted in evidence at the fact-finding hearing were true and accurate copies of the videos he viewed on the suspect's computer. He testified that he did not make any observations that led him to believe that the video footage had been tampered with or altered in any way. The videos were date-stamped from May, June, and July 2019.
In the course of the investigation, the State Police obtained a New York State driver's license of the male occupant of the house and also a student school identification card of the teenage girl who lived in the house. The identification cards portrayed the individuals in the videos. A detective with the State Police testified that he showed screenshots from the videos to the mother, who identified the female in one image as her daughter and the male in another as her boyfriend. The mother refused to view the videos.
The mother contends that petitioner failed to authenticate the videos through the testimony of a person who witnessed the events, made the videos, or had sufficient knowledge of the surveillance system to show that it accurately recorded the events. She further contends that petitioner failed to establish that the videos were not fabricated by the suspect. We reject those contentions.
The admissibility of video evidence rests within the sound discretion of the trial court so long as a sufficient foundation for its admissibility has been proffered (see People v Patterson, 93 NY2d 80, 84 [1999]). In determining whether a proper foundation has been laid, the accuracy of the object itself is the focus of inquiry (see People v McGee, 49 NY2d 48, 59 [1979], cert denied 446 US 942 [1980]). "Accuracy or authenticity is established by proof that the offered evidence is genuine and that there has been no tampering with it" (id.; see People v Price, 29 NY3d 472, 476 [2017]). A video "may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the video[ ] accurately represents the subject matter depicted" (Patterson, 93 NY2d at 84). A video may also be authenticated, however, by "[t]estimony, expert, or otherwise . . . establish[ing] that [the] video[ ] 'truly and accurately represents what was before the camera' " (id. [emphasis added]). "[T]he foundation necessary to establish [authenticity] may differ according to the nature of the evidence sought to be admitted" (Goldman, 35 NY3d at 595 [internal quotation marks omitted]).
We agree with the court that the videos were sufficiently authenticated and that "any alleged uncertainty went to the weight to be accorded the evidence rather than its admissibility" (People v Houston, 181 AD3d 477, 478 [1st Dept 2020], lv denied 35 NY3d 1027 [2020] [internal quotation marks omitted]). The video came into police possession through unusual circumstances, and through the investigation, the police were able to corroborate much of what was depicted in the video. The testimony of the FBI agent and the State Police detective authenticated the videos through circumstantial evidence of their "appearance, contents, substance, internal patterns, and other distinctive characteristics" (People v Franzese, 154 AD3d 706, 707 [2d Dept 2017], lv denied 30 NY3d 1105 [2018]; see Guide to NY Evid rule 9.05 [6], Methods of Authentication and Identification, https://nycourts.gov/judges/evidence/9-AUTHENTICITY/9.05_METHODS.pdf [last accessed May 16, 2024]; see also Jordan, 181 AD3d at 1249-1250; see generally Goldman, 35 NY3d at 595-596). The testimony at the fact-finding hearing established that the videos depicted the living room of the home in which the mother, the subject children, and the boyfriend lived. The State Police detective testified that the mother identified her daughter and boyfriend in screenshots taken from the videos; that he observed cameras in the house, including in the living room; and that he observed that the living room and its furnishings matched what was shown in the videos. As the court noted, the same couch, afghan, end table, and lamp were all visible in the videos and photographs. Other particularly specific items the police recovered from the home were also seen in the videos. In addition, the mother, the children, and the boyfriend were all easily identifiable in the videos. The court determined that the "actions, dialogue, and behavior shown in the videos show no indication of any tampering." In other words, there were "distinctive identifying characteristics" in the videos themselves (Goldman, 35 NY3d at 595). There was also the "significant fact" that the mother did not dispute that (id.). Rather, the mother confirmed through the screenshots from the videos that the individuals shown were her children and boyfriend. In addition, the FBI agent testified that he primarily investigated child pornography and performed digital forensic work and that he saw no signs of alteration or tampering with the videos. We therefore conclude that petitioner established that the videos "accurately represent[ed] the subject matter depicted" (id. [internal quotation marks omitted]), and we further conclude that the court acted within its "founded discretion" (Patterson, 93 NY2d at 84) in admitting them in evidence.
Contrary to the mother's further contention in appeal No. 1, the court's finding of abuse is supported by a preponderance of the evidence (see Family Ct Act § 1046 [b] [i]). Because the mother failed to testify, the court was permitted to "draw the strongest inference that the [*2]opposing evidence permit[ed]" (Matter of Nassau County Dept. of Social Servs. v Denise J., 87 NY2d 73, 79 [1995]; see Matter of Ariana F.F. [Robert E.F.], 202 AD3d 1440, 1442 [4th Dept 2022]; Matter of Noah C. [Greg C.], 192 AD3d 1676, 1678 [4th Dept 2021]). Although the mother did not directly participate in the boyfriend's sexual abuse of the daughter, the evidence permitted the court to infer that the mother knew or should have known about the abuse and did nothing to prevent it (see Matter of Lynelle W., 177 AD2d 1008, 1008 [4th Dept 1991]; see also Matter of Peter C., 278 AD2d 911, 911 [4th Dept 2000]).
The court afforded the videos great weight based on clear evidence of their reliability, including that the room depicted in the videos was the same room that was shown on photographs taken by the police when they searched the home where the mother, her children, and her boyfriend lived. We note that the mother refused to view the videos of the abuse; that she returned to the home with her children even though the State Police asked her not to do so; and that she chose not to refute any of petitioner's evidence.
Contrary to the mother's contention in appeal No. 2, we conclude that the facts surrounding the abuse of the daughter were "so closely connected with the care of" the son so as to justify the finding of derivative abuse (Matter of Wyquanza J. [Lisa J.], 93 AD3d 1360, 1361 [4th Dept 2012] [internal quotation marks omitted]; see Matter of Alyssa C.M., 17 AD3d 1023, 1024 [4th Dept 2005], lv denied 5 NY3d 706 [2005]).
Contrary to the mother's further contention in appeal No. 2, the dispositional provisions of the court's order, including those requiring her to engage in domestic violence counseling, attend a sexual abuse prevention program, and admit that the sexual abuse had occurred, were "consistent with the best interests of [her son] after consideration of all relevant facts and circumstances, and [were] supported by a sound and substantial basis in the record" (Matter of Martha S. [Linda M.S.], 126 AD3d 1496, 1497 [4th Dept 2015], lv dismissed in part & denied in part 26 NY3d 941 [2015] [internal quotation marks omitted]; see generally Matter of Derrick C., 52 AD3d 1325, 1326-1327 [4th Dept 2008], lv denied 11 NY3d 705 [2008]).
All concur except Whalen, P.J., who dissents and votes to reverse in accordance with the following memorandum: I respectfully dissent and, for the reasons set forth below, I would reverse the order and dismiss the petition in each appeal.
As noted by the majority, the digital video files at issue in this case were obtained in 2022 by the Federal Bureau of Investigation (FBI) from an individual (suspect) who was under investigation for possession of child pornography. Following further investigation, law enforcement came to believe that the files contained home surveillance video recorded in May, June, and July 2019 inside respondent mother's home, where the mother lived together with her boyfriend and the children who are the subject of these proceedings.
The majority concludes that "the videos were sufficiently authenticated through testimony [at the fact-finding hearing] regarding their source and how they were discovered in conjunction with testimony supporting the conclusion that the videos depicted the area and individuals they purported to depict." I disagree with that conclusion and instead conclude that the facts of this case are materially indistinguishable from those in People v Patterson (93 NY2d 80, 84 [1999]).
In Patterson, the trial court admitted in evidence a surveillance video that purported to show a crime that took place inside a shop. There was no authentication testimony from the parties who witnessed the events or from the shop owner who maintained the surveillance system; instead, the trial court relied on testimony from police officers who identified one of the individuals shown on the video and confirmed that the video accurately depicted the "physical layout" of the area where the purported crime had taken place (People v Patterson, 242 AD2d 740, 741 [2d Dept 1997], revd 93 NY2d 80 [1999]). The trial court further relied on evidence of chain of custody, specifically that officers "obtained the videotape directly from [the shop owner] approximately two weeks after the crime and kept it in their possession, unaltered, until the trial" (id.). Although the Court of Appeals reversed the conviction on other grounds, it nevertheless addressed the "inadequate basis for admissibility" of the video, noting that "the trial record . . . lack[ed] authentication to justify" admission of the video due to the "foundational vacuum" and failure to provide a full chain of custody (Patterson, 93 NY2d at 85).
Here, as in Patterson, there was no testimony from a party who witnessed the events depicted in the videos or from a person who controlled or maintained the system that made the recording. Instead, as in Patterson, petitioner offered testimony as to the identity of the subjects of the video and testimony verifying the location where the video took place. Moreover, the chain of custody evidence offered here was significantly weaker than what was offered in Patterson inasmuch as petitioner did not submit any testimony from the suspect who purportedly recorded the videos in 2019, only from the FBI agent who transferred the videos from the suspect's computer more than two years later. The agent testified that he had experience "perform[ing] digital forensic work," but did not elaborate on how that experience trained him to identify alterations to videos. Although he further testified "that, based on his technical experience and expertise, the video showed no signs of being manipulated or altered," he provided no explanation or basis for this belief. "[G]iven the inability of the witness to testify regarding" the accuracy or possible editing of the videos, as well as "his lack of personal knowledge as to the creation of the proffered [videos] and how [they] came into the possession of the" suspect, I conclude that the agent's testimony did not, on its own, provide a sufficient basis for their authentication (Torres v Hickman, 162 AD3d 821, 823 [2d Dept 2018]).
Although the Court of Appeals in People v Goldman (35 NY3d 582 [2020]) applied a less stringent authenticity standard with respect to the admission of a music video file uploaded to YouTube, the Court noted that the video "was introduced for its relevance to defendant's motive related to territorial gang activity—which is not an element of the offense—rather than specifically offered for its truth" (id. at 595). Here, inasmuch as the daughter denied that the abuse took place and inasmuch as the boyfriend did not testify at the fact-finding hearing, the videos are the only evidence that would support a finding of abuse.
Because petitioner failed to provide a sufficient legal foundation establishing that the videos "accurately represent[ed] the subject matter depicted" (id.; see Patterson, 93 NY2d at 85), I conclude that the videos should not have been admitted. Without the videos, there is no evidence to sustain the petitions, and I would therefore dismiss them.
Even assuming arguendo that the videos were properly admitted, I further disagree with the majority that petitioner established by a preponderance of the evidence that the mother abused the daughter, and I conclude that petitioner also failed to establish that the mother derivatively abused the son. The court determined that the mother abused the daughter because the mother "knew or should have known" that the boyfriend was sexually abusing the daughter, "but did nothing, allowing the abuse to continue." I acknowledge this Court's precedent in some cases that both abuse and neglect may be shown where a parent knew or should have known of abuse and failed to stop it (see Matter of Cory S. [Terry W.], 70 AD3d 1321, 1322 [4th Dept 2010]; see also Matter of Lynell W., 177 AD2d 1008, 1008 [4th Dept 1991]). To the extent that those cases stand for the proposition that a finding of neglect may be made against such a parent, that proposition meets the standard set forth in the statute inasmuch as a parent who knew or should have known that a child was being abused but failed to intervene may be found to have failed "to exercise a minimum degree of care" and to have acted "unreasonably" under the circumstances (Family Ct Act § 1012 [f] [i] [B]; see generally Matter of Angelina M. [Marilyn O.], 224 AD3d 1223, 1223-1224 [4th Dept 2024], lv denied — NY3d — [2024]; Matter of Boryana D. [Victoria D.], 157 AD3d 1011, 1012 [3d Dept 2018]; Matter of Dayanara V. [Carlos V.], 101 AD3d 411, 412 [1st Dept 2012]). However, to the extent that those cases stand for the proposition that a finding of abuse may be sustained on an identical basis, or indeed on any basis less than actual knowledge, I respectfully conclude that they were wrongly decided and should no longer be followed (see Dayanara V., 101 AD3d at 412; Matter of Jose Y. [Georgina Y.], 177 AD2d 580, 581 [2d Dept 1991]; see generally Family Ct Act § 1012 [e] [iii] [A]).
Here, even taking into account the adverse inference against the mother, I conclude that "the record does not support a finding of actual knowledge that would constitute abuse" of the daughter (Jose Y., 177 AD2d at 581). Inasmuch as there is no evidence that the mother had actual knowledge of the abuse of the daughter and, moreover, no evidence that the son was abused or was aware of any abuse, I further conclude that the derivative abuse finding as to the son was not supported by the record (see Matter of T.S. [K.A.], 200 AD3d 569, 570 [1st Dept 2021], lv denied 38 NY3d 904 [2022]; see generally Matter of Cleophus M.B. [Erika B.], 90 AD3d 1512, 1512 [4th Dept 2011]).
Finally, even if there had been a proper determination of derivative abuse, I conclude that the dispositional provisions of the order in appeal No. 2 did not reflect a resolution consistent with the son's best interests under the unusual circumstances of this case (see generally Matter of Martha S. [Linda M.S.], 126 AD3d 1496, 1497 [4th Dept 2015], lv dismissed in part & denied in part 26 NY3d 941 [2015]). After the children were removed, the mother found employment and moved into new housing without the boyfriend. She also completed a parenting class and attended all visits with the children. The sexual abuse alleged in the petitions did not involve the son, who denied knowledge of any inappropriate behavior in the house. Further, because the daughter consistently maintained that no abuse had taken place, the court's requirement that the mother admit that the sexual abuse had occurred was, in effect, a requirement that the mother reject the word of her daughter and instead rely solely on the disputed video evidence. Taking the unusual provenance of the videos into account, and weighing the damage that might be done to the son through the mother's failure to admit that another child had been sexually abused against the damage that might be done through a foster-care or group-home placement, I submit that return to the mother is in the child's best interests. For all of those reasons, I would reverse the order and dismiss the petition in each appeal.
Entered: July 3, 2024
Ann Dillon Flynn
Clerk of the Court